Our next case is Tolbert v. Odum Concrete Products, Inc. Attorneys Eli Hedowski and Dennis Smith. And I think I forgot in the last case, when you step up for the recording, please state your name for the record so we can determine that. All right, if you're ready to proceed, representing the appellant is Eli Hedowski. Am I saying that correctly? Yes, you are. Thank you. Good morning, Your Honors. Eli Hedowski for Appellant, Plaintiff, Stephen Tolbert. This case, the issue is today whether Millstone Weber, who was the general contractor on the I-57 improvement project, had the right of control over Roy Rogers, who was somebody who was on the job site working on behalf of ReadyMix Concrete. ReadyMix is a subsidiary of Odum Concrete. They are basically one and the same, so I'm going to refer to them as ReadyMix. They essentially are the same entity. The trial court ruled in favor of ReadyMix on the summary judgment action, as you know, and the issue is whether there was sufficient control. It's a factual issue. It's a factual issue that we believe still has to be determined by a jury. There's multiple factors to bring this about. The employee-employer relationship depends on right of control as the main thing. The seven factors that break that down include the manner in which the performance of the employee's duties is directed, whether the alleged employee pays the employee, or the employer pays the employee. Does the alleged employer have a right to discharge the employee from the job site? What, if any, contractual terms exist between the general employer and the alleged loan employer? The general employer's ability to substitute among employees working with the alleged loan employer, the length of employment, and the skill of the employee. When we talk about the manner in which the performance is directed, we look at Beasley. Michael Beasley was the person running the grinder operator. We had a grinder that was grinding concrete, a hose going from that grinder into an empty concrete truck with the drum on the back. They were catching that. It's called a slurry mix because there's water involved, and they're dumping it at a batch site. So rather than bringing material to a job site, they're taking it away. Beasley testifies that he had less than a minute of information that he directed to Rogers before they started their process. This happened on August 24th of 2016. That was the first day that Roy Rogers had ever been on that job site. He eventually was on that job site less than two hours. And less than an hour of that was in the operation of his concrete truck working in tandem with Beasley's grinder. There's a question whether any direction by Beasley, but we know it's less than a minute that he told them, here's what we're going to do. This boils down to information and cooperation on a large job site. It doesn't mean there's subordination from Rogers to Beasley, but they have to work together. Much like we're all working together here, I was directed where to go on the second floor of the courthouse. He was directed where to go on the job site with his truck, where to drive in conjunction with the grinder. So this is an issue of cooperation and coordination rather than subordination. The Richard case is very on point on this. We cited that case where the driver had to adhere to directions as to taking asphalt onto a job site, where to go. They were giving them directions. One of the operators of a truck did not follow those directions and injuries happened. And it was a very similar fact pattern in that somebody showed up that was hired to operate a truck on a job site hauling materials. The court in that case did not find that there was a lone employee relationship. The mode of payment. There's an affidavit from Tim Never, who is a representative of ReadyMix, where he says essentially Rogers was paid by Millstone Weber because they were paid by Millstone Weber. There's a Hastings case versus Jeffco that was cited that totally opposes this view and this affidavit. The opinion by the appellate court in that case says it does not pass through. We don't know what taxes, if any, were taken out. We don't know the rate of pay of that employee. Was this argument made to the trial court, the mode of payment? I know the affidavit was brought up. So it was brought up by the opposing side. So I think there may have been a mention of it. But the Hastings case totally deflects that argument. It says that unless you're paying directly on this situation, there's no way that this factor discourages the notion. So they found that it discourages the notion that there's a lone employee relationship for him. The right to discharge. After this incident occurred, Rogers and there was three trucks on site from ReadyMix that day working on the Millstone Weber I-57 project. After the incident occurred, eventually the two other trucks showed up. They had been there earlier and had left to dump the load at the batch plant. They had returned. Rogers was told he was no longer needed after the other two empty trucks showed up. In Rogers' testimony and Beasley's testimony, neither of them testified that he was fired or discharged from the job site. He was simply informed he was no longer needed with his truck because the others were there. So was there a right to discharge as a question? And was he discharged as a question? Again, these are questions of fact that we're still pretty fuzzy about, questions of fact that really should be determined by ultimately a jury. I didn't see in the record where this argument was made to the trial court either the right to discharge or anything about the discharge. I think you're correct. Mr. Hadowski, I want to ask you about the time when they made a pass through. Right. And Mr. Rogers, I guess, didn't do it quite the way they wanted it done. Right. It seems to me that during that first pass, they controlled his subsequent activity by directing him on how to do the job better. By Beasley's own testimony, he said he gave him a pep talk. That was about here's where we need you to be and where we need you to go. Well, is a pep talk control over the work? He's not driving the truck. He's not telling him how to drive. He's telling him where he needs to be on the job site. It's a coordination. It's information more than control. It's very similar to some of the cases we've cited where they're instructing them where to operate, where to take the equipment, how to take the equipment. It's a matter of safety. It's a matter of coordination. They're working together on a large job site. I don't think he controlled it. Rogers could have left at any point in time. He could have said, I don't think that's the right way to do it. He had every opportunity to do that, and he still would have been employed by ReadyMix. Do you think it raises a question of fact in this case that precludes some of the judgment? Most definitely. Most definitely. Why?  What is the issue for the jury? Well, I think the opposing side is saying that he controlled, Beasley controlled Rogers, Millstone, Weber controlled Rogers because of giving him some direction on where to go on the job site. But that level of control is mere cooperation. It's informational. He gave him a minute of instruction before they started the process. He gave him probably just moments, seconds of information before they started the second pass. I think that has to give a jury a decision whether he was controlling them at that time. That's a factual issue for a trier of fact. The terms of any written contract. There is no written contract in this case. There was an invoice after the fact that said they were paying $85 per hour for each truck that was rented with a man to drive it, an operator. There's, I believe, an over-reliance and confusion on the A.J. Johnson case by the respondent. The A.J. Johnson case has facts that are very dissimilar to the facts in this case. They had an 18-year-long relationship between the two parties. They regularly used each other's equipment. They stored equipment on each other's property and transported it for each other free of charge. There was a cooperation and communication between them that was way above and beyond anything that Millstone, Weber, and Redimix ever did in this situation. Furthermore, probably the most important distinction with the A.J. Johnson case is that involved an employee who was seeking workers' compensation benefits rather than a third-party claim. And I believe where the trial court may have been led astray was relying on the analysis that's used for a workers' compensation claim rather than a third-party claim. That involves different factors or weighing of factors compared to a third-party. There's a presumption that while working for a second company, an employee performs the business tasked with them by their general employer, the presumption is that the general employment continues. Roger's general employment was operating a concrete truck, driving it, whether it was picking up materials or depositing, delivering materials. He was directed by his employer to operate his truck that day. That's one of the general tasks that he was given and that he did day in and day out on behalf of Redimix. There was nothing different in that. The general employer's ability to substitute among employees, loan to the borrowing employer, is another factor. In this situation, Matthew Powelson was the supervisor for Millstone Weber that called up and made the request for three trucks and operators to come to the job site on August 24th. He didn't say, I need this guy, I need this guy, and I need this guy by name. He just said, I need trucks and operators. There's an implied belief that the operator would have to have a CDL because those trucks have to have a CDL to operate it. Beyond that, he did not give any instruction as to what qualifications they would need, except that they had experience operating a concrete mixer truck and they could come to the job site to take materials away from them. In this situation, that means that Redimix and their dispatcher, they could control who went there. They could have sent any number of their employees to the site. They happened to send Rogers and two others. They could have took Rogers off that site afterwards. They would have always had the right to control him. There was nothing that changed. This argument was not made at the trial court either, was it? It was not. Back to Justice Cates' question about what the jury is to determine. My understanding is that the motion for summary judgment, the defendant filed several affidavits supporting, and the plaintiff did not file any counter-affidavits. That's correct. I believe the testimony and the depositions were sufficient to overcome the affidavits. The affidavits seemed to not really be on point. Particularly… If no counter-affidavits are filed, aren't the affidavits that are filed required to be taken as true? Do you think the deposition previously supersedes that? There was testimony of depositions. I think that that did counter that, yes. It would have been duplicated. Mr. Hedowski, so far I haven't heard you argue. Maybe I'm confused, but aren't you here asking us to reverse summary judgment? Absolutely. Well, I hear you talking about how ReadyMix controlled their employee… Right. …and how Millstone Weber controlled their employee, but aren't you asking us to look at how Millstone Weber controlled the ReadyMix employee? That's the issue, yes, and I don't believe that… And I haven't heard that argument, and maybe I'm missing it, but… Well, that… But I hear you saying how ReadyMix picked the driver and… Correct. …did this and did that and could have discharged him and picked. But how is it that Millstone Weber controlled the ReadyMix employee such that we should reverse? Where's the question about… I think you made my point for me, Your Honor. Millstone Weber did not control the ReadyMix driver, and because they didn't control the ReadyMix driver, they did not assume a position of employment over the ReadyMix driver. Well, then you have summary judgment. Their argument is that Millstone Weber was the de facto employer of Rogers, who was the ReadyMix driver, and if Millstone Weber was the employer of Rogers, then my client, Steven Tolbert's, only remedy is through workers' compensation. Oh, I see. Okay. Because it would be a co-employee. And to your point, Millstone Weber did not exert control over the ReadyMix driver. They only coordinated and gave information. The control at all times remained with ReadyMix over Rogers, and because they retained that control… So you're saying the question of fact is the tension between the workers' compensation issue and the ReadyMix employment issue, that they picked the driver, they set the driver, they decided what qualifications the driver needed, et cetera. Correct. ReadyMix decided all that. They had control over that employer. And that employee, certainly Morestone, more so than Millstone. And because of that, Millstone did not have sufficient control to be deemed a loaned employer over a loan employee. And since there's not an employee-employer relationship, Rogers to Tolbert is a third party and is allowed to bring a third-party action against him and his employer. So when I asked you about that first pass, because that seemed significant to me, when there was an interaction as to the work that was being performed, this pep talk that was given was not an instruction to do better or to line your truck up a certain way. It was simply, you know, you've got to do better. I think even if there was some instruction, that is accepted. There's some cases that were cited where they're given hand signals and somebody disregarded a hand signal, and because of that, another employee was injured. It's the same situation on these job sites. Yes, there has to be at least some instruction about where to be, when to start, where to go. But just getting some instruction that's informational does not make Rogers a subordinate to Beasley, and it does not make Rogers an employee of Millstone. Okay. But it would certainly raise, in your view, a question of fact. Correct. Correct. That's exactly right. I think I'm close to being out of time, if I'm not very far out of time. There were two more factors, and length of employment was one, which, as we said, it was about an hour. There were some cases that showed a week was even deemed a very minimal amount. The other one was level of skill required. Again, it's all been drafted and briefed for Your Honor, so I'm sure you're familiar with that. Thank you for your time. Thank you. Good morning, Mr. Smith. Good morning, Your Honors. May I proceed? Again, please state your name for the record. Sure. May it please the Court, Counsel, I'm Brian Smith, and I represent Roy Rogers, Ready Mix, and Odom Concrete. As Mr. Hedowski rightly said, the real issue in this case is control. The Supreme Court in A.J. Johnson-Paving called control the main criterion when determining whether a person is a loaned employee. And the facts in this case, in viewing them, lie most favorable to the plaintiff. It is obvious that Millstone Weber controlled Rogers at the time of the occurrence and had the authority to do so, and in fact did so. And for that reason, summary judgment must be affirmed. Regarding the facts of Millstone Weber's control, I think it's important to note from the onset, Millstone Weber is the general contractor on this highway repaving job. They have a contract with the Illinois Department of Transportation, which required them, they being Millstone Weber, to maintain control over the supervision of the day-to-day activities of leased employees and be responsible for the quality of work of leased employees. At a minimum, this is a tacit admission. Is the term leased employees defined in the contract? I do not believe that it was, but I know that it is used in that specific instance. How is it defined in the case law? A leased employee? Leased employee. Usually it's a borrowed employee. In the case law, it's been borrowed employee, loaned employee, leased employee. They seem to be- Do they use the word leased employee in the case law? In the case law that I have cited, I don't believe the term leased employee is specifically used, and I'm not aware of any term of art that would change the definition from leased employee to borrowed employee to loaned employee. But that's Millstone Weber's contract, which is, again, a tacit admission that they are going to be ultimately responsible and direct and control every person on that job site. And how do they exercise this control? Well, Rogers was instructed by ReadyMix where to show up, what time to show up, and do what the Millstone Weber people tell you to do. That was his only instruction from ReadyMix. That's it. And what did ReadyMix know? And this is all undisputed, by the way. ReadyMix knew when Rogers was to show up, where he was to show up, and that they would be loading and dumping slurry. They had absolutely, neither Rogers nor ReadyMix nor Odom Concrete had any idea of the grinding operation that was to occur. They had no idea that Rogers was to be driving in tandem with a grinding machine operated by a Millstone Weber employee, connected by a hose. They had no idea of any of this. So when ReadyMix instructs Rogers, they say, you go here at a certain time and you do what Millstone Weber tells you to do. And so what did Millstone Weber tell Rogers to do? Whether the length of the instruction is relevant, I don't know. But the only instruction he got was from Millstone Weber, and it was this. You are going to drive in tandem with a grinding machine, and you are going to be attached by a hose. And apparently he did this so poorly on the first pass that Beasley, Millstone Weber's manager who was in charge of this grinding operation, got out and gave a pep talk, and I think that you could kind of use air quotes with that. But what Beasley testified to that he gave Rogers was, quote, a little pep talk, you know, kind of what we were looking for again, end quote. That's recess. We told him what to do. We told him the expectation. We told him exactly what we were looking for, and he didn't do it. What you're looking for or what your expectation is seems to me to be a lot different than you've got to do it this way, you've got to go so many miles per hour, you've got to stay directly parallel to the other truck, et cetera. That seems to me a little, or at least a question of fact as to what we're looking for. As it relates to after the first pass? Yes. Well, I don't think there is any question of fact that he was instructed specifically about the miles per hour and about having to ride in tandem in parallel. He was? Somebody put that in an affidavit? I believe that's in the depositions, the instruction that was given. So there was no question as to what Rogers was supposed to do, and that information was given to him by Beasley of Millstone Weber. But he didn't do a very good job. He did a poor job. That's right. At least according to Beasley, who then has to re-instruct him, and let's do a second pass, and it's during the second pass that the occurrence happens, so we don't have a third pass. After that, the uncontroverted affidavit says Beasley told Rogers to get lost, despite the fact he didn't have a whole truck. Did he say the words, get lost, or we don't need you anymore? No, that's my words. Kicked him off the job site. That's what happened. The way you're using some slang here can be interpreted differently under the law. When you say get lost, that means fire, which is very different from we don't need you anymore. So let's stick with what's in the record. Sure, Your Honor, and I didn't mean to conflate by using slang, but I will say that— I just don't want to be confused. Sure. Fired, dismissed, let go. I point this court to the Wilfong case, where part of the analysis on whether the employer, the University of Illinois, had the ability to discharge was the lone employee at issue there was sent home by the university when there was no work to be done. So whether it's dismissed or sent home, the bottom line is, however it's phrased, Millstone Weber told Rogers to leave the job site. It really brought him down to control. The idea that Redding makes his instructions, where, when, and report to Millstone Weber, that is control over Rogers' actions. It really—if you put it in this hypothetical, if Rogers had shown up and there was no one from Millstone Weber there, would Rogers have initiated the grinding sequence? Would he have connected the hose to his truck and told people, okay, here's what we need to do? The answer to that is no. So it can't be said that Rogers got all of the information he needed from Redding Mix, because if Millstone Weber hadn't been there when Rogers got there, Rogers wouldn't have done anything. That's the level of control, and it doesn't make any difference how long it took. It doesn't—and I would point to A.J. Paving, or A.J. Johnson Paving. This is a case that the injured person, it happened that morning. It could have been an hour or less, and this involved a paving machine, okay? And it's a Supreme Court case interpreting a then-Industrial Commission, now Workers' Compensation, finding that a person was a borrowed employee. The Puzzle Council seems to think that that negates the effect of A.J. Johnson. I would say that it's absolutely the opposite of that. This Court knows that its standard of review of Commission decisions is on fact questions, is manifest way to the evidence, and the reason for that is very obvious. The reviewing courts give great deference to the Commission when they are determining questions of fact as it relates to what comes under the Workers' Compensation Act. And so, as far as I'm concerned, the Supreme Court affirming what the Commission has found as the criteria of a borrowed employee should give great weight, should be given great weight, and be very persuasive in this particular instance. And, oh, by the way, the distinctions that the plaintiff makes with respect to the A.J. Johnson case, they don't have anything to do with what the Court analyzed, because what the Court analyzed is exactly what we've been talking about here. Control, right to discharge, payment, those sorts of things. So, the ongoing... In all those issues, I asked Mr. Kodowsky several questions about, was this argument raised at trial court? And almost everyone I asked, he said no. If I understood him correctly at the beginning, he said there were seven factors or seven issues, but by my count, five of those seven were not raised at the trial court. They didn't raise length of employment, how payment was made, ability to discharge, level of substitution of employee's loan, or level of skill. Those five were not addressed at trial court. Am I missing something? No, you're not missing something, Your Honor. You're exactly right. And the factor with respect to pay, you know, the plaintiff wants to make much of this, but the Supreme Court in A.J. Johnson paving said that's not enough. You know, even if the payment is coming from here, from the actual employer versus the borrowing employer, that's not enough to negate a loaned employee situation. And in that case, which is factually very similar to this case, the person with the paving machine was told where to go and where to pave, and that's basically it. He had control over the paving apparatus. He got to decide, you know, how to operate the vehicle, and I don't even think we have that in this case. But in that case, that was enough for the Supreme Court to say the commission's right, he is a borrowed employee. A case that the plaintiff has not even addressed is the Wilhelm case, and I think this is extremely instructive because it is a summary judgment case. And in that case, the University of Illinois had hired a general contractor, and then that general contractor sent equipment and an operator to the university, and that person got direction from the university, go here this day, go there that day, we don't have anything for you to do today, go home. And then when that person did something that injured another university employee, the appellate court said that person is a loaned employee, so you cannot sue your co-employee because your exclusive remedy is the Workers' Compensation Act. And it's the same in the Bituminous case. In the Bituminous case, you've got two days of borrowed employment, so not very much. And the only instruction was they were doing railroad ties, and the instruction was empty this and smooth it out on these railroad ties. And the court there found as a declaratory judgment action that the court there found it's a borrowed employee. You got all of your information. You got all of your instruction, all of it, from the borrowing employee. In a declaratory judgment action, was there discovery? Was there an opportunity for both sides to present their argument? Isn't that different than summary judgment?  As it relates to discovery, I honestly do not know. But based on what I read from the case itself, it seems like both sides were able to put their best feet forward. And so those three cases in particular are so factually similar to this, to this case, that there isn't a remaining question of fact. And so the circuit court's grant of summary judgment was absolutely proper, because ordinarily this is a fact question. But in light of these facts weighed against this law, there's not a fact question. Could you respond briefly to my question, Mr. D'Alessio, about the battle of affidavits, the defense file of affidavits in regard to the summary judgment? Yes. He said we didn't have to because the depositions raised evidence that were in our favor. I certainly disagree 100 percent when it comes to Tim Maverick's affidavit. And I disagree when it comes to Roy Rogers' affidavit, because the affidavit touched on things that were not part of Rogers' deposition. I don't believe Maverick has not been deposed in this case. And this was raised at the circuit court level as well. Why didn't you file counter affidavits? So I believe and stated in the brief that what has been asserted in those affidavits should be accepted as true, for the failure of counter affidavits to be filed, because these affidavits were not sufficiently challenged by any other mechanism, deposition or otherwise, to defeat what the presumption of accuracy and truthfulness. Well, what portion of the affidavit do you think was not defeated in Mr. Avers' affidavit by the deposition of Mr. Rogers? Well, I don't. Tim Maverick has not been deposed. And Roy Rogers, to the extent he testified about things that Tim Maverick would have testified, I don't know how he would have known those things. Well, my question is Tim Maverick's filed an affidavit, right? Yes. And you said that there were things in the Maverick's affidavit that were not rebutted by Mr. Rogers' deposition. That's correct. What is it specifically that was not rebutted? Certainly the pay. The pay issue? The pay issue. And what did Mr. Maverick say about the pay issue? He said that the payment that was received from Millstone Weber was used to reimburse Rogers. So it went through ReadyMix? Through ReadyMix to Rogers. And again, the pay issue... Didn't go from Millstone to the employee, to Rogers? Correct. It did not go from Millstone Weber to Rogers. And what else was in the affidavit that was not rebutted? Do you want to just give me a moment? It's fine. Would it be all right if I grabbed it? Sure. Thank you. I see my time is up. Go ahead. Okay. Thank you. Go ahead. And unfortunately, the affidavit is not attached to my copy of our motion for summary judgment. So I do not have it in front of me. So it's not attached to your motion for summary judgment? It is attached to the one that was filed. It's not attached to the one that I brought with me today. Okay. All right. I appreciate your... Thank you. If you have no other questions... Thank you, Your Honor. Mr. Hedowski, rebuttal. Thank you, Your Honor. Briefly, I'd like to point to the Hastings case and point out that this was a case involving a loaned employee that was also decided on summary judgment. The court in that case reviewed it de novo, as should be done in this case. To quote them, we find no support in the record for Jeffco's claim that the area indirectly paid Winn-Dill's salary for the project, such that this factor supports a finding that area controlled Winn-Dill. However, the record shows that Jeffco is merely a conduit through which Winn-Dill was paid. It's a very similar scenario as what we have here. There was an invoice. The invoice doesn't say this much for the truck, this much for the operator. It doesn't break anything down. It says $85 an hour. It gives however much the total was. Certainly, we would assume that some operators are paid at a higher rate if they've had more experience over time or some other subspecialties. There's nothing in the record defining what Rogers made per hour, how he was paid. There's no tax information whatsoever in the record. There's nothing outside of a very balanced affidavit from MAPR. If I can leave anything with you, this was a case of cooperation rather than subordination. It's a question of fact and control, whether Millstone Weber had sufficient control over the Rogers who was the ReadyMix employee. These are factual issues that are still in dispute, factual issues that must be determined by a trier of fact at a trial court level rather than a judge in a bench situation on a summary judgment. Your Honor, you pointed out that many factors were not addressed earlier at the trial level, and that is absolutely correct. There are seven factors to consider. Some may weigh one way, some may weigh another, but when you look at all of those factors, they certainly don't weigh in favor of Millstone Weber having a lone employee relationship over Rogers. I would encourage you to find in favor of the appellant in this matter and overturn the summary judgment order. Thank you. Thank you. Thank you. We'll also take this matter under advisement and issue a decision in due course. Thank you. We appreciate your audience today.